Filed 10/2/13  P. v. Murphy CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B241593 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA356622) |
| v. | |
| MATTHEW MURPHY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Matthew Murphy appeals from the judgment entered following his convictions by jury on count 1 – first degree felony murder (Pen. Code, § 187) with a robbery special circumstance finding (Pen. Code, § 190.2, subd. (a)(17)(A)) and count 2 – second degree robbery (Pen. Code, § 211) with a finding as to each offense that he personally and intentionally discharged a firearm causing great bodily injury and death (Pen. Code, § 12022.53, subd. (d)) and committed the offense for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)).  The court sentenced appellant to prison for a total unstayed term of life without the possibility of parole, plus 25 years to life.  We affirm the judgment.

## FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that about 11:45 a.m. on April 27, 2009, Joseph Walker was a security guard at a school near 53rd and Vermont.  He was a retired Los Angeles police officer.  He had been a police officer for 31 years.  Walker saw Pablo Tzoc, the decedent, trying to enter a school building.  Walker told Tzoc that Tzoc could not enter.  Tzoc began walking away.

As Tzoc was walking away, appellant and another man ran towards Tzoc.  Tzoc tripped and fell.  Appellant produced a gun and fired about five shots into Tzoc.  Appellant laughed and the second man was "yelling [appellant] on."  Appellant bent down toward Tzoc's body and Walker lost sight of appellant's hand.  Appellant then stood and fled.  Walker identified appellant at trial as the shooter.

Gloria Yac testified that about 11:45 a.m. on April 27, 2009, she was in her residence at 53rd and Vermont.  She heard shots, looked out her window, and saw two men standing next to each other and one robbing the other.  The robber was holding the victim and going through the latter's pockets.  Yac told police the robber was standing above or over the victim as the robber was taking items from the victim's pockets.  Yac testified she was somewhat confused at trial.  The robber fled, chased by a third man.

2

Damien Morris, who was born in August 1993, testified as follows.[1] About 11:45 a.m. on April 27, 2009, Morris and appellant were near 53rd and Vermont. Appellant told Morris that appellant was looking for Hispanics to rob. Appellant robbed a Hispanic man and five or six shots were fired. Morris fled.

On or about May 14, 2009, Morris talked with appellant, who was in jail. In a conversation that was surreptitiously monitored, Morris told appellant that Morris had no part in the murder. Morris also said, "All I did was just see you and you, you did what you did. I never . . . had no part of looking out for you or nothing. Am I right?" Appellant replied, "Yep." Appellant told Morris that Morris had an alibi. Morris asked what appellant did with the "burner" and appellant later replied ". . . I got that motherfucker, but it's put up" and "[n]obody could get to it."

Morris also testified as follows. Morris told appellant that Morris was at the corner, all Morris saw was appellant walk away from Morris, Morris heard a gunshot, and Morris fled. Appellant agreed that that was all Morris did, but appellant told Morris not to tell anyone. Morris asked appellant why appellant shot "him" and appellant replied appellant did not want to talk about it. Morris later asked appellant ". . . why you shoot the [racial epithet] though? Cause he try what?" Appellant replied, "He tried to grab some shit."

Police searched the crime scene and found a partially smoked cigar about 17 feet from Tzoc. Forensic analysis revealed appellant's DNA profile on the cigar. A medical examiner determined Tzoc died as a result of four gunshot wounds to his back.

Los Angeles Police Officer Steven Sieker, a gang expert assigned to the 77th Division, testified as follows. Sieker was assigned to work the Five-Deuce Hoover Crips gang (Crips). He was also assigned to other gangs, including the "51 Nothing But Trouble" gang (Trouble) that was closely allied with the Crips. The area of 52nd and Vermont was in Crips territory. The primary activities of the Crips included homicides,

---

[1] Morris's trial testimony consisted of his preliminary hearing testimony admitted into evidence. (See part 1 of the Discussion, *infra*.)

attempted murders, and robberies. If a violent crime occurred at 52nd and Vermont, there would be a very strong inference in the community that the crime was related to the Crips. Appellant and Morris were Crips members.

According to Sieker, a gang member committed crimes while accompanied by a gang member or associate to enhance the reputation of the first gang member. Gang members enjoyed a reputation for violence. The gang benefited from having a violent reputation, since this instilled in citizens a fear of retaliation if they cooperated with police regarding the crime. A violent crime committed in broad daylight would enhance the gang's reputation.

The prosecutor posed a hypothetical question and Sieker assumed the following as facts, i.e., at 11:45 a.m., a Crips member was on 52nd and Vermont in close proximity to a Crips member or associate; the first Crips member approached and shot a transient male in the back four times; and the first Crips member then took items from the victim's pocket and fled with the associate or other person. Sieker opined the crime would have been committed for the benefit of the Crips. Sieker's opinion was bolstered by the fact the shooter, in the presence of the other gang member, unnecessarily shot the victim four times in the back and laughed while looking at the associate.

During cross-examination, Sieker testified it was his understanding appellant, Morris, and another person were present during the commission of the crime. Morris told Sieker that a Trouble member was present during the crime. The principal basis for Sieker's opinion the crime was committed for the benefit of a street gang was the fact it was done in the daytime in front of other gang members, i.e., Crips and Trouble members. Sieker had encountered instances in which a gang member would fabricate that another person committed a gang-related crime and the gang member would fabricate a moniker for the person. Sieker testified 99 percent of Crips members were African-Americans.

2. *Defense Evidence*.

In defense, appellant testified as follows. Appellant associated with Crips members and was unwillingly "jumped into" the gang. Appellant was Morris's friend. On April 27, 2009, Morris, appellant, and a person named Zig Zag were walking around, and Morris and Zig Zag told appellant that Morris and Zig Zag were looking for people to rob.

As Morris, appellant, and Zig Zag were crossing the street at 53rd and Vermont, Morris and Zig Zag saw a Hispanic man walking towards them. Zig Zag said, " 'Let's get him.' " Morris crossed the street and Zig Zag pulled out a gun. Appellant, afraid, began running down 53rd and heard gunshots. Appellant also testified that when Zig Zag pulled out the gun, appellant began running and Zig Zag started shooting. Appellant testified he heard something go past his ear, turned around, and "that's when I seen him with the gun. He was looking down, . . ."

Later that day appellant denied to a detective that appellant knew Morris. Appellant did not want to be known as a snitch. According to appellant, a few days after the killing, Zig Zag told appellant that Zig Zag put up the gun and burned the wallet. Zig Zag told appellant not to talk to police anymore.

At some point, Morris phoned appellant. Appellant believed Morris was with other Crips members at the time. Appellant did not want to say the wrong thing. Appellant told Morris a gun was "put up." Appellant indicated to Morris that appellant "[shot] the guy" because the guy " 'pulled some shit.' " Appellant told the above to Morris only because appellant thought Crips members were listening to the conversation.

A defense psychologist testified concerning various factors affecting the reliability of alleged eyewitness identifications.

3. *Rebuttal Evidence*.

In rebuttal, Los Angeles Police Department Detective Refugio Garza testified he was assigned to this case and, on April 27, 2009, while searching for evidence, he found a

wallet in an alley adjacent to 52nd between Vermont and Hoover.[2] Los Angeles Police Detective Colin Braudrick testified that during a search of appellant's house, Braudrick found lyrics written by appellant. The lyrics referred to the Crips, the Neighborhood Crips gang, and the killing of rival gang members. A portion of the lyrics said, " 'Fuck around with me and get yourself smoked.' " The word "smoked" was slang for shooting somebody. Los Angeles County Sheriff's Deputy Joseph Eiland, a gang investigator, testified he was unable to locate any record of a Crips member with the moniker Zig Zag.

## ISSUES

Appellant claims (1) the trial court violated his constitutional rights to confrontation and due process by admitting into evidence at trial Morris's preliminary hearing testimony, (2) the trial court erroneously precluded appellant from arguing to the jury his third party culpability defense, (3) the trial court erroneously rejected appellant's offered stipulations, (4) there was insufficient evidence supporting the true finding as to the gang allegations, and (5) the trial court erroneously failed to instruct sua sponte concerning the incidental robbery theory as it related to robbery-murder and the robbery special circumstance.

## DISCUSSION

1. *The Trial Court Properly Admitted Into Evidence Morris's Preliminary Hearing Testimony.*

a. *Pertinent Facts.*

After the jury was sworn, but prior to the presentation of evidence, the prosecutor, on October 12, 2011, suggested she might proffer at trial Morris's preliminary hearing testimony. The court scheduled an admissibility hearing for October 13, 2011. At the October 13, 2011 hearing, Braudrick testified as follows. Braudrick was the investigating officer. Witnesses were reluctant to come to court when the case was gang-related, especially if the witnesses were fellow gang members. Morris was affiliated with the

---

[2] Appellant concedes the wallet belonged to Tzoc.

Crips, and was appellant's friend. After Braudrick spent two weeks looking for Morris, Morris testified at appellant's preliminary hearing.

On September 27, 2011, at the prosecutor's request, Braudrick began trying to serve Morris with a subpoena for trial, but Braudrick had difficulty doing so. Morris's family members told Braudrick that Morris had not been home recently, Morris was afraid, and he did not want to testify.

On September 29, 2011, Braudrick spoke with Morris's sister, with whom Braudrick had a very good relationship. She called Morris, told him that Braudrick was looking for him, and gave Morris's phone number to Braudrick. Morris hung up the phone. Braudrick called the number later but it was disconnected. On October 4, 2011, Braudrick served Morris with a subpoena and told Morris he had to appear in court on October 11, 2011. Morris told Braudrick that Morris did not want to testify.

On October 11, 2011, the parties announced ready for trial, but Morris failed to appear. The court issued and held a body attachment for Morris, and Braudrick tried to contact him. About 2:45 p.m., Morris, calling from a blocked phone number, left a voicemail for Braudrick. In the voicemail, Morris said he was sorry he had missed court and he had wanted to be there. Morris also told Braudrick to leave a message with Morris's sister and Morris would appear in court on October 12, 2011. At 8:40 p.m., Braudrick called Morris's sister at her home and left a voicemail indicating Morris needed to be in court at 11:30 a.m. on October 12, 2011.

On October 12, 2011, Morris failed to appear. Braudrick again tried to contact him. The court released the body attachment for Morris. Braudrick attempted to go to Morris's known addresses. Braudrick also briefed a "gang unit" and sent it to locate Morris. Braudrick further testified "South Bureau Gang" patrolled the area looking for Morris, searched his house about 10:00 p.m., but was unable to locate him. These efforts began about 8:00 p.m. and continued until midnight.

7

On October 13, 2011 (the day of the admissibility hearing), Braudrick made additional efforts to locate Morris. At 3:00 a.m. on October 13, 2011, Braudrick had the 77th Division watch commander send a patrol unit and a supervisor to check the area, and they searched Morris's house. Morris was on probation, and one of his probation conditions required that he remain at that house every night. Police went to the house during the evening and later at night, but Morris was not there. Later during the morning of October 13, 2011, Braudrick patrolled the area around Morris's house and searched for him. Braudrick saw four Crips members at 51st and Figueroa, asked if they had seen Morris, and they replied no.

Still later, at 9:45 a.m., Braudrick went to Morris's house and contacted Morris's sister. She told Braudrick the reason Braudrick could not find Morris was Morris was intentionally avoiding appearing in court. Morris's sister did not know where Morris was. Morris's sister called Morris on the phone, Morris answered, and Morris's sister handed the phone to Braudrick. Morris hung up. Morris's sister later tried to call Morris several times but his phone was off and her calls went to his voicemail.

During cross-examination, Braudrick testified as follows. Braudrick told Morris's family between eight to 12 times that Braudrick would provide witness protection for Morris and relocate him. Morris was afraid of appellant. When Braudrick initially served Morris with a subpoena, Morris said appellant had told Morris that appellant had paperwork indicating Morris was a snitch.

At the hearing, the court tentatively indicated Braudrick repeatedly had tried to contact Morris through his sister, and "extraordinary efforts were conducted within the last 24 hours when [Morris] failed to appear in court pursuant to the served subpoena." Appellant acknowledged it was difficult to serve a subpoena on someone like Morris. However, appellant maintained that because it was the first day of trial testimony, the trial court was required to delay introduction of Morris's preliminary hearing testimony pending further efforts by Braudrick to locate Morris.

8

The court found the People had established both Morris's failure to comply with a lawfully served subpoena and the People's due diligence in securing Morris's attendance at trial. The court commented Morris had made obvious efforts to avoid being arrested and brought to court to testify.

b. *Analysis.*

Appellant claims the trial court violated his constitutional rights to confrontation and due process by admitting into evidence at trial Morris's preliminary hearing testimony. Appellant argues the People failed to exercise due diligence to locate Morris; therefore, the People failed to demonstrate he was unavailable as a witness. Appellant maintains this is so because there was no evidence that, in an effort to locate Morris, law enforcement (1) contacted Morris's family (other than his sister), (2) contacted the probation department or Morris's probation officer, or (3) provided to "other law enforcement jurisdictions" information identifying Morris. We reject appellant's claim.

First, the burden is on appellant to demonstrate error; it will not be presumed. (*In re Kathy P.* (1979) 25 Cal.3d 91, 102 (*Kathy P.*); *People v. Garcia* (1987) 195 Cal.App.3d 191, 198.) Appellant has not demonstrated the People failed to contact Morris's family (other than his sister) or the probation department, or that the People failed to provide to "other law enforcement jurisdictions" information identifying Morris. The fact the record does not demonstrate these efforts occurred does not constitute proof they did not occur.

Second, even if appellant had demonstrated the People's alleged failures, we would reject his claim. There is no dispute Morris's preliminary hearing testimony was admissible at trial if he was constitutionally unavailable for purposes of the Confrontation Clause. In *People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*), our Supreme Court stated, "A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. (*Id.* at p. 622.) The lengths to which the People must go to produce a witness is a question of reasonableness." (*Ibid.*)

9

The proponent of the evidence has the burden of showing the witness is unavailable. (*People v. Smith* (2003) 30 Cal.4th 581, 609.) "We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera*, *supra*, 49 Cal.4th at p. 623.)

There is no dispute the People exercised due diligence in locating Morris up to and including the point Morris, on October 11, 2011, failed to appear at trial despite the fact Braudrick had served a subpoena on him. Appellant's argument pertains only to the issue of the People's due diligence after Morris failed to appear on that date.

We have recited the pertinent facts. The record reflects on and after October 11, 2011, Morris, fearing retaliation if he testified, successfully avoided police who were searching for him by a variety of means. He failed to comply with court orders, i.e., the trial subpoena, as well as his probation condition. His defiance of his probation condition contributed to the People's inability to secure his attendance. Appellant's argument in the trial court pointed to no deficiency in the People's showing of due diligence other than the alleged deficiency that the People could have made additional efforts to locate Morris because the day of the admissibility hearing was the first day of trial testimony. "That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] . . . . It is enough that the People used reasonable efforts to locate the witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.)

We conclude the People exercised due diligence to secure Morris's attendance at trial, he was unavailable as a witness from October 11, 2011, through October 13, 2011, inclusive, and the trial court did not violate appellant's confrontation right or due process right by admitting into evidence Morris's preliminary hearing testimony.

2. *The Trial Court Did Not Erroneously Restrict Appellant's Jury Argument.*

    a. *Pertinent Facts.*

During the People's case-in-chief, Braudrick testified during cross-examination that Braudrick had heard from some witnesses that there were different numbers of suspects. Appellant's counsel asked Braudrick whether some witnesses described seeing *three* suspects. Braudrick replied, "One witness." Appellant's counsel asked Braudrick, "Some described seeing *two* suspects, correct?" (Italics added.) Braudrick replied, "Majority of witnesses, all except for one, and it would be probably seven, nine people."

During appellant's closing argument, appellant's counsel commented, "But when [Braudrick] took the stand, and asked [*sic*], detective, did you have *reports* of eyewitnesses saying that there were . . . two *and* three suspects that were seen? And he said, yes, they had those reports." (Italics added.) Appellant's counsel then commented "we know about two other people [i.e., Morris and appellant] present."

The following then occurred: "[Appellant's Counsel]: But there are *reports* out there, you know, of a *third person*. [¶] [The Prosecutor]: Objection, your Honor. Outside the scope of the evidence. [¶] The Court: Sustained. . . . [¶] [Appellant's Counsel]: . . . [¶] Detective Braudrick conceded he has received such . . . information. [The Prosecutor]: Objection -- [¶] The Court: Sustained. . . . [¶] [The Prosecutor]: Motion to strike. [¶] The Court: Sustained. [¶] Counsel, you must limit your argument to the evidence that is before this jury."

Later, appellant argued to the jury that appellant testified as follows. Morris crossed the street around 53rd, and appellant said to himself, " 'I don't know why he's doing that.' " Zig Zag pulled out a gun, appellant fled, and appellant felt a bullet go by his ear. Appellant and the shooter ran down the alley. Appellant was not the shooter.

11

b. *Analysis*.

Appellant, citing the above quoted colloquy during which appellant's counsel commented, "But there are *reports* out there, you know, of a *third* person," (italics added) claims the trial court erroneously precluded appellant from arguing to the jury his third party culpability defense. We disagree.

During jury argument, appellant's counsel commented to the effect there were *reports* of eyewitnesses that there were two *and* three suspects. The comment erroneously *suggested* Braudrick had testified there were *multiple* reports of eyewitnesses that there were *three* suspects. The prosecutor did not object to the comment, perhaps because Braudrick had testified to the effect there were multiple reports of eyewitnesses that there were two suspects, *coupled with one* report from one eyewitness that there were *three* suspects.

However, appellant's counsel's later comment during jury argument went beyond a mere suggestion there were multiple reports of eyewitnesses that there were three suspects. Appellant's counsel later explicitly commented, "there are *reports* [plural] out there, . . . of a *third person*." (Italics added.) Appellant's counsel later said Braudrick had conceded he had received such information. In our recitation of the pertinent facts, we have quoted what Braudrick testified. Appellant does not direct our attention to any testimony by Braudrick that there were "reports" of a "third person."

Penal Code section 1044 requires a trial court to limit argument of counsel to relevant and material matters. (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1387.) A trial court has the responsibility to limit argument to defenses supported by substantial evidence. (*Id.* at p. 1386.) "[T]he California Supreme Court has upheld the exercise of discretion by trial judges which have limited the right of counsel for the accused to present factually unsubstantiated contentions to a jury." (*Id*. at p. 1388.)

Appellant concedes he presented to the jury third party culpability *evidence*. Our recitation of the pertinent facts reveals appellant also presented jury *argument* concerning that defense. Appellant explicitly argued he was not the shooter, and appellant suggested

12

Zig Zag was the shooter. The fact appellant, during jury argument, may have been satisfied to explicitly deny that he was the shooter while only suggesting Zig Zag was the shooter did not mean the trial court precluded appellant from arguing a third party culpability defense.

All the trial court did here was properly preclude appellant's counsel from presenting the particular factually unsubstantiated argument that there were multiple reports of a third person. The trial court did not, by precluding that particular argument, abuse its discretion or violate appellant's constitutional rights to due process, to counsel, to confront witnesses, or to present a defense. Even if the trial court abused its discretion by precluding that particular argument, appellant otherwise argued his third party culpability defense and there was ample evidence of his guilt; therefore, the alleged state law error was not prejudicial. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

3. *The Trial Court Did Not Err by Permitting Francisco Tzoc to Testify.*

During the People's case-in-chief, appellant, outside the presence of the jury, indicated the prosecutor planned to call Francisco Tzoc (Francisco), the decedent's nephew, as a witness. The court asked the prosecutor for an offer of proof as to relevance.

The prosecutor represented, inter alia, as follows. A "wallet insert with photographs" was found in the alley, and Francisco could identify the photographs as depicting Tzoc's relatives. The prosecutor represented, "I think also [Francisco] can testify that [Tzoc] was not involved in gangs or had no gang tattoos. That he was . . . a human being. For the purposes of 187."

The court indicated an autopsy photograph had established Tzoc was human. The following then occurred: "[The Court:] With respect to your offer of proof as to the wallet being in fact that of the victim makes perfect sense to me." [¶] [Appellant's Counsel]: We would stipulate." (*Sic.*) The court indicated it understood but would not

insist that the People join in the stipulation. The court asked the prosecutor to limit her questions to her offer of proof.

During trial, Francisco testified, inter alia, as follows without further objection. A photograph displayed at trial depicted Tzoc, Francisco's uncle. Francisco never knew Tzoc to have been involved with criminal street gangs or to have gang tattoos.

The prosecutor showed Francisco photographs. One depicted Tzoc's daughter. The prosecutor indicated there was "another photograph on this wallet insert," and Francisco testified the photograph depicted Tzoc's wife. The prosecutor asked whether a portion of a wallet that the prosecutor was displaying belonged to Tzoc. Francisco indicated he was not sure.

Appellant claims the trial court erroneously rejected appellant's offer to stipulate Tzoc was a human being, Tzoc was not a gang member, and the wallet insert recovered from the vicinity of the shooting contained photographs of Tzoc's family. Appellant also maintains the trial court erroneously allowed Francisco to present irrelevant and inflammatory testimony on those issues. We disagree.

First, the burden is on appellant to demonstrate error; it will not be presumed. (*Kathy P.*, *supra*, 25 Cal.3d at p. 102.) Fairly read, the record demonstrates appellant offered to stipulate only to the fact the wallet belonged to Tzoc. To the extent appellant's claim relates to any other alleged stipulation offer, his claim fails.

Second, " ' "[T]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness." ' [Citation]." (*People v. Homick* (2012) 55 Cal.4th 816, 878.) We review for abuse of discretion a trial court's decision not to compel such acceptance. (*People v. Waidla* (2000) 22 Cal.4th 690, 723, fn. 5 (*Waidla*).)

Appellant, by his stipulation offer, effectively conceded the relevance and admissibility of proof concerning the wallet. The trial court reasonably could have concluded appellant's offered stipulation would have deprived the People of the force of the evidence that real, tangible property—a wallet—was taken from a real human being

14

whose life was brutally ended during a robbery. The trial court did not abuse its discretion by not compelling the People to accept appellant's offered stipulation concerning the wallet.

Evidence that Tzoc was homeless and not involved with gangs was relevant and admissible to show Tzoc had been innocently at the scene and had not engaged in gang-motivated violence prior to appellant's offenses. The trial court did not abuse its discretion by allowing Fernando to testify on these matters. (See *Waidla*, *supra*, 22 Cal.4th at pp. 717, 723-724.) Moreover, Francisco never testified as to Tzoc's obvious status as a "human being," Francisco ultimately was unsure in his identification of a portion of the wallet, and there was ample evidence of appellant's guilt. No prejudicial evidentiary error occurred. (Cf. *Watson, supra,* 46 Cal.2d at p. 836.)

4. *Sufficient Evidence Supported the True Findings as to the Gang Enhancement Allegations.*

The jury found as to each of counts 1 and 2 that appellant committed the offense "for the benefit of, at the direction of, or in association with" a criminal street gang within the meaning of former Penal Code section 186.22, subdivision (b)(1). Appellant claims there is insufficient evidence supporting these findings. We reject appellant's claim.

There is no dispute Crips was a "criminal street gang" within the meaning of Penal Code section 186.22, subdivision (b)(1). There was substantial evidence as follows. Appellant violently murdered and robbed Tzoc, shooting him four times in the back. At the time, appellant was with Morris, and both were Crips members. A member of Trouble, a gang that was a close ally of the Crips, was also present. A gang member committed crimes while accompanied by another gang member or associate to enhance the reputation of the first gang member. The murder occurred in broad daylight in Crips territory. Appellant's companion was "yelling [appellant] on." Appellant told Morris that appellant was looking for Hispanics to rob. The overwhelming majority of Crips members were African-Americans, and appellant testified Zig Zag said, " 'Let's get

15

him,' " referring to a Hispanic man. The jury reasonably could have concluded based on all the evidence that appellant had said this, not Zig Zag.

Sieker testified if a violent crime occurred at 52nd and Vermont, people in the community would strongly infer the crime was related to the Crips. When Crips members committed violent crimes in broad daylight, this enhanced the gang's violent reputation. Crips benefited from this reputation because it instilled in citizens a fear that there would be retaliation if they aided the prosecution of Crips members for their crimes. Sieker opined the crimes were committed for the benefit of the Crips. Braudrick found, in appellant's home, lyrics written by appellant referring to Crips. A portion of the lyrics said, " 'Fuck around with me and get yourself smoked,' " i.e., shot.

Appellant testified he denied to a detective that appellant knew Morris. The jury reasonably could have concluded appellant denied knowing Morris to falsely minimize the involvement of both Morris (a fellow Crips member) and the Crips in the shooting. Appellant also testified he admitted the shooting to Morris because appellant believed Crips members were listening to appellant's conversation with Morris. The jury reasonably could have believed appellant truthfully admitted the shooting to Morris to enhance the violent reputations of appellant and the Crips, and that enhancing those reputations was one of appellant's objectives when he committed the crimes.

We conclude there is sufficient evidence supporting the true findings as to the gang enhancement allegations, including sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant committed the present offenses "for the benefit of, . . . or in association with any criminal street gang" within the meaning of former Penal Code section 186.22, subdivision (b)(1). (Cf. *People v. Abillar* (2010) 51 Cal.4th 47, 59-63; *People v. Leon* (2008) 161 Cal.App.4th 149, 163; *People v. Romero* (2006) 140 Cal.App.4th 15, 19-20; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198-1199.)

16

5. *There Was No Need for the Trial Court to Instruct Sua Sponte on the Incidental Robbery Theory.*

Appellant claims the trial court had a sua sponte duty to instruct on the incidental robbery theory as it related to robbery-murder and the robbery special circumstance. We disagree.

As our Supreme Court stated in *People v. Lewis* (2009) 46 Cal.4th 1255 (*Lewis*), "the felony-murder special-circumstance finding must be 'based upon proof that the defendant intended to commit the underlying felony separately from forming an intent to kill the victim; that is, the felony was not merely an afterthought to the murder, as when, for example, the defendant intends to murder the victim and after doing so takes his or her wallet for the purpose of making identification of the body more difficult. [Citation.]' [Citation.]" (*Lewis*, at p. 1300, quoting *People v. Rundle* (2008) 43 Cal.4th 76, 156.) However, " 'Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 554.)

There is no dispute there was sufficient evidence that, prior to the shooting, appellant expressed an intent to rob. However, appellant argues he later harbored only an intent to kill, and not an intent to rob, when he saw Tzoc. Appellant maintains the evidence Tzoc was homeless was evidence from which the jury reasonably could have inferred appellant concluded Tzoc had no money, leading appellant to abandon his intent to rob him. However, there was no evidence homeless people have no money, appellant believed that, or appellant, based on that belief, abandoned an intent to rob Tzoc. Instead, there was ample evidence appellant harbored independent concurrent intents to rob and kill Tzoc.

Appellant also maintains the fact appellant shot Tzoc four to five times at close range, killing him, was not consistent with concurrent intents to kill and to rob. However, "We have observed that 'when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing *was* for purposes of robbery.' [Citations.] 'If a person commits a murder, and after doing so takes the

17

victim's wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money.' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 187, italics added.)

Finally, there was substantial evidence that appellant used fear with intent to rob Tzoc when appellant caused him initially to flee, and that appellant used force with intent to rob Tzoc when appellant later shot him in the back. Notwithstanding appellant's suggestion to the contrary, the fact appellant still later used additional force to rob Tzoc when appellant held Tzoc and went through his pockets did not require the trial court to give incidental robbery instructions.

The trial court was under no duty to instruct sua sponte on the incidental robbery theory as it related either to robbery-murder, or to the robbery special circumstance because, in light of the facts in this case, the theory cannot properly be characterized as a general principle of law that was closely and openly connected with the facts before the trial court (*People v. Phillips* (1985) 41 Cal.3d 29, 60) and there was no substantial evidence to support such instructions. (Cf. *People v. Tufunga* (1999) 21 Cal.4th 935, 944; *People v. Harden* (2003) 110 Cal.App.4th 848, 861-864.)

### *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


KLEIN, P. J.


ALDRICH, J.